AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO
APR 15 2025
MITCHELL R. ELFERS
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
IN THE MATTER OF THE SEARCH OF A SM-S135DL CELLPHONE, IMEI: 350963864060509, CURRENTLY LOCATED AT THE FBI LAS CRUCES RESIDENT AGENCY

Case No. 25-677 MR

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which attached and incorporated fully by reference herein.see Attachment

located in the _____ District of ___New Mexico___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A, which attached and incorporated fully by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1151,1153 (a),2241(c),2241(a)(1),2243 (a),2252(a)(4)(B),2252A(a)(2)A | Crimes Occurring in the Indian County Aggravated Sexual Abuse of a Minor, Sexual Abuse of a Minor, Possession of Child Pornography, and Receipt or Distribution of Child Pornography |

The application is based on these facts:

See Attachment C, which attached and incorporated fully by reference herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent David Gabriel
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04-15-2025

_____
Judge's signature

City and state: Las Cruces, New Mexico

United States Magistrate Judge Kevin R. Sweazea
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SM-S135DL CELLPHONE, IMEI: 350963864060509, CURRENTLY LOCATED AT THE FBI LAS CRUCES RESIDENT AGENCY AND MORE FULLY DESCRIBED IN ATTACHMENT A. | Case No. 25-677 MR |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE.

I, David Gabriel, having been duly sworn, do hereby depose and say:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent of the Federal Bureau of Investigations (FBI) since May 2018. I am classified, trained, and employed as a federal law enforcement officer with statutory arrest authority charged with conducting criminal investigations of alleged violations of federal criminal statutes, including Title 18 of the United States Code. I am currently assigned to the Albuquerque Field Office, Las Cruces Resident Agency, New Mexico. Prior to my current position, I was employed for six years as an analyst and briefer in a federal intelligence service. I am currently assigned to investigate violations of federal law, including violent crimes against children.

2. During my tenure with the FBI, I have received formal and informal training in conducting a variety of criminal investigations. I have participated in the execution of dozens of search warrants and seized evidence of these violations, conducted surveillance, and investigated

violent crimes against children and crimes occurring on Indian reservations. I have conducted hundreds of interviews, to include witness, subject, and victim interviews.

3. The statements in this affidavit are based on my own investigation as well as information from other agents and law enforcement; information I have received from other agents and law enforcement personnel about their experience, training, and background; and my experience, training and background. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause for the requested warrant.

4. The following information contained in this affidavit is based on my training and experience, my personal participation in this investigation, and information provided to me by other law enforcement officials. Unless otherwise indicated, where I have referred to written or oral statements, I have summarized them in substance and in part, rather than verbatim. Not all of the facts of the investigation known to me are contained herein, only those necessary to establish probable cause to search the below-listed items pertaining to the captioned investigation.

5. This affidavit is made in support of an application for a warrant to search, under Federal Rule of Criminal Procedure 41, a SM-S135DL cellphone, IMEI: 350963864060509, belonging to John Albert Carrillo Jr. ("the Device"), more fully described in Attachment A, currently located at the FBI Las Cruces Resident Agency at 2509 N Telshor Blvd. Las Cruces, NM 88011, concerning violations of 18 U.S.C. §§ 1151, 1153(a), §2241(c), §2241(a)(1), §2243(a), 2246(2)(C), 2252(a)(4)(B), and 2252A(a)(2)(A), which cover sexual abuse of a minor in Indian Country.

## LEGAL DEFINITIONS

6. The following terms are relevant to this affidavit in support of this application for a search warrant:

   a. Child Pornography: The term "child pornography" is defined at 18 U.S.C. § 2256(8). It consists of any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. See 18 U.S.C. §§ 2252 and 2256(2), (8).

   b. Computer: The term "computer" refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, mobile phones and devices, and tablets. See 18 U.S.C. § 1030(e)(1).

   c. Electronic mail ("e-mail" or "email"): "E-mail" refers to a method of exchanging digital messages from an author to one or more recipients. Users may attach digital media to their e-mails. Modern e-mail operates across the Internet or other computer networks. E-mail systems are based on a store-and-forward model. Email servers accept, forward, deliver and store messages. E-mail accounts may be accessed by computers, to include smartphones and tablets.

   d. Minor: The term "minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

   e. Sexually Explicit Conduct: The term "sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

   f. Visual Depictions: "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

3

g. Sexual Act: "Sexual Act" means, *inter alia*, the penetration, however slight of the anal or genitalia opening of another by a hand or finger or any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."

## RELEVANT STATUTES

7. The following statutes are relevant to this affidavit in support of this application for a search warrant.

   a. Title 18 U.S.C. §1151 states, "[e]xcept as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

   b. Title 18 U.S.C. §1153(a) states that "[a]ny Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

   c. Title 18 U.S.C. §2241(c) makes it a federal crime to knowingly engage in a sexual act within the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not obtained the age of 16 years (and is at least 4 years younger than the person so engaging).

   d. Title 18 U.S.C. §2241(a)(1) makes it a federal crime to knowingly cause another person to engage in a sexual act – by using force against that other person.

   e. Title 18 U.S.C. §2243(a) makes it a federal crime to knowingly engage in a sexual act with another person who (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging.

   f. Title 18 U.S.C. §2252(a)(4)(B) makes it a federal crime for any person to knowingly possess or access with the intent to view any visual depiction of a minor engaging

in sexually explicit conduct through the use of any means or facility affecting interstate or foreign commerce.

g. Title 18 U.S.C. §2252A(a)(2)(A) makes it a federal crime for any person to knowingly receive or distribute any child pornography through the use of any means or facility affecting interstate or foreign commerce.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

8. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

9. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence

5

      may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  f. I know that when an individual uses an electronic device to produce child pornography, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

10. *Nature of examination.* Based on the foregoing, and consistent with Rule 41 (e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## PROBABLE CAUSE

12. On February 15, 2025, your affiant was notified by BIA Special Agent (SA) Jacob Glossop of an alleged child sexual assault which took place on the Mescalero Apache Indian reservation. According to BIA's information, 35-year-old Carrillo sexually assaulted 15-year-old

Doe earlier that morning at a location which I know from my training and experience to be within the bounds of the Mescalero Apache Indian Reservation. I reviewed the Mescalero Apache Tribal Census and determined Carrillo is a tribally recognized Mescalero Apache Indian.

13. The following information was provided to me by BIA: In her initial interview with BIA, Doe stated that the day before the assault she came up to the Mescalero/Ruidoso area with her father to visit a nearby landmark (after a visit the prior day as well.) Their car got stuck, and Doe's father called Carrillo, a family friend, for help with getting the car out. The group then went to a casino for the men to drink. They returned to Carrillo's house on the Mescalero reservation and the men continued to drink, including a third unidentified male. Carrillo was very intoxicated. On February 15, 2025, Doe fell asleep around 3:00 a.m. When Doe woke up, Carrillo was rubbing her leg and taking a blanket off of her. Carrillo told Doe to follow him outside. Doe walked outside and Carrillo opened up his car and told Doe to come with him so Doe could "get some dick." Doe was cold and angry at Carrillo's behavior, so she declined and returned inside. Doe believes another individual, hereinafter referred to as Witness #1, observed this happen between Carrillo and Doe. Doe went back inside to sleep in the room where her father was already asleep. Carrillo came in as well and started rubbing Doe's leg. Carrillo was using his thumb on Doe's private parts, over the pants. Doe pushed Carrillo away. Carrillo then stopped and went to pee in an attached bathroom with the door open, where Doe could see his private parts. Carrillo then returned and began touching her legs again. Doe shoved him off again and Carrillo got angry. Carrillo then got behind Doe. While this was happening, Doe, her father, and Carrillo were all in the same bed. Doe then got on her phone and went onto Snapchat to send Carrillo messages telling to leave her alone. She

also showed him these messages on her phone. Carrillo said words to the effect of "let me just finish real quick" and took Doe's phone to message words to the effect of "I'll be done by then." Doe continued to try to fight him off.

14.     Carrillo then reached all the way under Doe's pants and started touching her vagina, underneath her underwear. Doe was crying and begging Carrillo to stop. Carrillo continued to penetrate Doe's vagina with his hand. Another person, hereinafter referred to as Witness #2, came in and saw Carrillo's hands in Doe's pants. Carrillo then stopped sexually assaulting Doe.

15.     On February 19, 2025, Doe submitted to a Sexual Assault Nurse Exam and provided similar information as described above during the interview.

16.     On February 27, 2025, Doe was interviewed by an FBI Child Forensic Interviewer. Doe provided a version of events consistent with her statement to BIA and the SANE examiner. During this interview, which was more detailed than BIA's initial triage interview, Doe noted that Carrillo inserted the tip of his finger into her private parts that she uses to pee, noting it was the same area the SANE examiner swabbed her. Doe noted that during the sexual assault, Carrillo was big, and she was unable to push him away or stop his hand from penetrating her by force because of his size. Doe also noted Carrillo was attempting to remove her pants and his own clothing during this sexual assault, which she described as an attempted rape. I met Doe during this encounter and found her to be a small female teenager. In contrast, a review of Carrillo's Driver's License information and criminal history shows weights of 212 and 227 pounds. I later met Carrillo during my arrest of him and found him to be a solidly built male adult. Doe also noted Carrillo had his phone on him during this incident, hence her efforts to message him telling him to leave her alone.

17. Witness #1, #2, and #3 were interviewed by BIA later on the morning of February 15, 2025. Witness #1 reported he saw Carrillo go into his room with Doe while Doe and her father slept in the room. Carrillo was intoxicated, and Witness #1 knows Carrillo does stupid stuff when intoxicated. Carrillo and Doe frequently joke around, and he saw them play-wrestling. Witness #1 heard Carrillo wake up Doe and lead her outside. Witness #1 heard Carrillo tell Doe to get in his truck. They then returned into Carrillo's room. About 30 minutes later, Witness #1 and Witness #2 heard sounds coming from Carrillo's room. They opened the locked door and saw Doe and Carrillo lying side by side, with Carrillo's hand in Doe's pants. Carrillo was touching Doe's "private parts" in the front. Carrillo's hand "past his knuckles" was not visible under Doe's pants. Carrillo got up and said he wasn't doing anything. Witness #1 told Carrillo he saw what happened. Carrillo got mad because he could not find his keys or his pants. Carrillo then stated he was not a pedophile. Carrillo then tried to leave the scene. In my own meeting later with this Witness, he advised that he had fabricated the portion of his testimony to BIA about seeing Carrillo's hand in the victim's pants. However, I note that I also reviewed monitored jail calls of Carrillo where he encouraged the witnesses to alter their testimony to police and say they fabricated their earlier statements.

18. Witness #2 stated that early in the morning of February 15, 2025, he and Witness #1 opened a locked interior door in their home and found Carrillo lying next to Doe with his hands in her pants under her clothes. Carrillo was wearing only his short pants. Witness #2 described seeing "[Carrillo's] hand inside her private parts," at which point Carrillo got up and became agitated. Carrillo was telling Witness #1 and Witness #2 that he was not a pedophile and that he was not doing anything. Carrillo then attempted to find his car keys and pants to leave.

9

19.     Witness #3 reported that on February 15, 2025, she heard signs of "wrestling" before the incident. Witness #3 went into the room where Carrillo and Doe were to confront them and saw Doe and Carrillo laying side-to-side. Carrillo then told Witness # 3 to shut up and go back to bed. Later, Witness #3 saw Carrillo come out of the room wearing his short pants and a t-shirt. Carrillo started yelling that he was "not a pedophile" and kept repeating it. Witness #1 and #2 told Witness #3 they saw Carrillo with his hands in Doe's pants. Carrillo then started washing his hands aggressively trying to get everything off his hands. Witness #3 spoke to Doe, who told her that Carrillo was touching her inappropriately. Doe also showed Witness #3 messages between Doe and Carrillo in which he was seeking sexual intercourse with Doe. Witness #3 also noted to BIA that Doe showed a naked photo of herself that she had sent to Carrillo. Given Doe's status as a minor, this image, which is said to have been sent to Carrillo's phone by Doe, may constitute child sexual abuse material ("CSAM"), sometimes referred to as child pornography, and may still be located on Carrillo's phone. The facts in this case show that Carrillo sexually assaulted Doe, a minor. Since Carrillo shares that unusual disposition of being attracted to children, there is reason to believe that he may have images/videos on his phone of Doe and/or other children engaging in sexually explicit conduct. Further, the evidence shows that Doe and Carrillo were communicating with each other through their phones. Carrillo's phone has been lawfully seized and is the subject of this search warrant.

20.     BIA also provided me, as part of their reports, photographs they took of the messages Doe claimed to have sent to Carrillo during the incident. Below are two photos of those

10

messages, which corroborate Doe's story. As a note, I have redacted the name of Doe's boyfriend in the second image for his privacy, as I understand he is also a minor.





## **TECHNICAL TERMS**

21. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training and experience, the technical terms identified in this paragraph convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable

storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## BACKGROUND ON CHILD EXPLOITATION OFFENSES AND OFFENDER CHARACTERISTICS

22. I have had both training and experience in the investigation of computer-related crimes and child exploitation offenses. Based on my training, experience, and knowledge, I know the following:

   a. Computers and computer technology have revolutionized how sexually explicit material depicting minors is obtained, solicited, produced, distributed, and utilized. In general, computers, including cellular phones, serve four functions in connection with child exploitation offenses: communication, production, distribution/receipt, and storage.

   b. Persons engaged in child exploitation offenses most often use the Internet to do so. The Internet offers several different venues for obtaining, viewing, and trading sexually explicit images in a relatively secure and anonymous fashion. Individuals who use the Internet can communicate electronically by using e-mail and other chat or messaging services. E-mail messages can contain text, data, and images. This type of communication is private in that it is directed from one Internet user to another. Internet users can also communicate using chat rooms and instant messaging. Both chat rooms and instant messaging incorporate "real time" communication between Internet users. Instant messaging, like e-mail, is private, in that it is one Internet user communicating specifically, and exclusively, with another. Instant messaging may also occur with more than one person at a time. Internet Service Providers and web sites provide software and venue for such contact. The Internet offers a number of facilities, which allow users to access, distribute, and exchange information including the World Wide Web (WWW), File Transfer Protocol (FTP), electronic e-mail (E-mail), and postings on boards or newsgroups. The WWW allows users to display and access data in a multimedia format.

   c. Once persons engaged in child exploitation offenses obtain child pornography material from the Internet, as described above, they often maintain or store this material because the material is valuable to them. Offenders maintain or store child pornography material in a variety of ways. For instance, such persons may store child pornography material on computers, including smartphones, mobile phones and devices, storage devices (including USB drives) and tablets.

   d. Persons engaged in child exploitation offenses often use online resources to meet and communicate other like-minded individuals. The Internet afford such persons

14

several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

e. Persons engaged in child exploitation offenses often use online resources to meet and communicate with minors. Such individuals may receive sexual gratification, stimulation, and satisfaction from virtual contact with children. Such contact often includes conversations that are sexual in nature, requesting sexually explicit conduct from the child, or sending the child sexually explicit images to lower the inhibitions of children. Such persons often use online resources to meet and communicate with multiple minors at any given time.

## CONCLUSION

23. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

24. Assistant United States Attorney Jackson K. Dering V reviewed and approved this search warrant application.

Respectfully submitted,

_____
David Gabriel
Special Agent
Federal Bureau of Investigations

by telephone. KS

Subscribed and sworn to ~~before me~~ on this 15 day of April, 2025:

_____
UNITED STATES MAGISTRATE JUDGE

15